## IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| MICHELLE JAMES, as mother and next friend of MATTHEW OSBORNE, a Minor Child and TEAGAN OSBORNE, a Minor Child | |
| Plaintiffs, | CIVIL ACTION NO. |
| v. | |
| WORLD WRESTLING ENTERTAINMENT, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

### COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**Come Now**, Plaintiff, Michelle James, as mother and next friend of Matthew David Osborne and Teagan Lynn Osborne, ("Plaintiff") hereby complains of Defendant World Wrestling Entertainment, Inc. ("WWE" or "Defendant"),[1] and alleges as follows:

### INTRODUCTION

1.      Plaintiff, Michelle James, brings this action as the mother and next friend of Matthew David Osborne and Teagan Lynn Osborne, the children and successors-in-interest of Matthew Wade Osborne, aka "Matt Borne" and "Doink the Clown", a famous international professional wrestler whom wrestled for WWE beginning in 1985 and ending in 2007.

---

1 "World Wrestling Entertainment, Inc." and "WWE", as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., World Wrestling Federation Entertainment, Inc., World Championship Wrestling, Inc., and Extreme Championship Wrestling.

2.     Plaintiff brings this suit to recover for WWE's negligent and fraudulent mistreatment of Matthew Osborne which ultimately resulted in Matthew Osborne's wrongful death.   The Plaintiff alleges the WWE's concealment, omission, and denial of medical information pertaining to traumatic brain injuries caused severe, long-term neurological and physiological harm to Matthew Osborne, including an increased risk for developing long-term brain diseases such as depression, dementia, Alzheimer's disease, ALS, and CTE.   Plaintiff believes Matthew Osborne was substantially more likely than the general population to develop such diseases as a result of WWE's misconduct throughout his approximately twenty-two year career and until his untimely death.

3.     As a result of WWE's fraudulent and negligent concealment, misrepresentations, and acts and omissions, Matthew Osborne was never informed about the risks associated with concussion and sub-concussive injuries, or the likelihood of receiving concussions and sub-concussive injuries from sustaining head trauma while wrestling for WWE.   Through WWE's routine and systemic failure to assess, diagnose, and treat Matthew Osborne before, during, and after matches during his WWE career, and then by continuing to fail to inform Matthew Osborne of the associated long-term and latent risks and dangers of neurological injury sustained as a result of WWE's conduct, Matthew Osborne never learned or knew of the injuries he suffered from despite WWE's Talent Wellness Program, and did not seek the necessary treatment for his injuries, which led to further illnesses and injuries, including depression and drug abuse, which ultimately resulted in his untimely death.

4.     As a direct and proximate result of WWE's fraudulently concealing the risks and long-term consequences of sustaining repeated head trauma and suffering multiple concussions and sub-concussive injuries, and negligently assessing, diagnosing, and treating Matthew

Osborne throughout his wrestling career, WWE caused Matthew Osborne to suffer long-term, latent, debilitating, and permanent injuries which ultimately resulted in his death. Matthew Osborne suffered from a greater risk of the accumulation of long-term chronic and latent injuries, chronic traumatic encephalopathy (CTE), which Plaintiff seeks compensation and such further relief as justice may require for, and for financial losses, pain and suffering, loss of consortium, loss of enjoyment of life, and intangible human losses suffered by Plaintiff as a result of WWE's willful, wanton, reckless, and grossly negligent conduct and omissions.

5.     Matthew Osborne developed symptoms from post-concussive injuries, including signs of depression and anxiety, and had a greater risk for developing degenerative post-concussion brain injuries. Additionally, Plaintiff believes Matthew Osborne was at a greater risk for developing long-term brain diseases such as depression, dementia, Alzheimer's disease, ALS, and CTE. Plaintiff believes Matthew Osborne was substantially more likely than the general population to develop such diseases during and after his career with WWE as a result of WWE's misconduct.

6.     WWE has known for years that repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler such as Matthew Osborne would develop a permanent, degenerative brain disease. Instead of disclosing this information to wrestlers such as Matthew Osborne, WWE hid this necessary information and did so while preserving the huge profits of a brand built on a culture of unreasonably and unnecessary violent conduct.

7.     WWE took affirmative steps to mislead Matthew Osborne into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time. The accumulation of head trauma is exponentially more dangerous

than isolated blows, a fact WWE knew or should have known.  Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

8.      WWE's representations, actions, and inactions have caused Matthew Osborne initially to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein, and ultimately caused Matthew Osborne to lose his life prematurely, further causing Plaintiff and Matthew Osborne's heirs to suffer pecuniary losses, mental anguish, loss of companionship and society, and loss of inheritance, and other losses as alleged herein.

9.      WWE failed to disclose in a timely manner the true risks of repeated head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate traumatic head impacts (including sub-concussive injuries and concussions) and latent brain injury.  Indeed, by refusing to acknowledge the risks it was creating – and by attempting to conceal those risks from its wrestlers, such as Matthew Osborne – WWE effectively guaranteed that Matthew Osborne would not seek the help he needed to avoid latent brain injury and the resulting dangers and impacts it would have on his life.

10.     When forced to acknowledge the risks to which it subjects its wrestlers – by script, on a daily basis – WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.  Indeed, WWE continues a course of conduct designed to mislead its wrestlers, and designed to mislead Matthew Osborne until his death, about the injuries they sustained while wrestling for WWE by failing to disclose pertinent facts or offering misleading truths.

11.     Matthew Osborne had a special relationship with WWE.  Not only did he rely on WWE to script and direct the wrestling performances in a safe manner, he also relied on WWE

4

to communicate medical and safety information to him.  When WWE communicated medical and safety information to Matthew Osborne, WWE had superior information to Matthew Osborne about the long-term risks of repeated head trauma and had an ongoing duty to disclose accurate information to him.  According to Plaintiff, WWE breached its duty to disclose accurate information to its wrestlers, including Matthew Osborne, during and after their wrestling careers, specifically WWE breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in WWE and cognition impairing conditions such as depression and anxiety.  Matthew Osborne, with only a high school degree, justifiably and reasonably relied to his detriment on these negligent misrepresentations by omission.

12.     WWE's medical personnel are subject to the standards of the profession at the time that the medical care was provided.  Concussion research during the years Matthew Osborne wrestled for WWE was such that WWE had actual notice of the causal connection between head trauma suffered while wrestling for WWE and long-term neurological injury. Matthew Osborne would not reasonably have been expected to research medical literature during his employment with WWE, nor would he have been expected to know the sophisticated medical jargon and language of the medical profession.  Plaintiff reasonably relied on WWE's superior knowledge and position of authority, evidenced by the special relationship between Matthew Osborne and WWE, which resulted in Matthew Osborne's reliance to his detriment on WWE's fraudulent concealment and omissions regarding his health and safety.

13.     Plaintiff, as mother of Matthew Osborne's minor children and heirs, seeks a declaration of liability, injunctive relief, and financial compensation for the loss of financial support, living, travel, medical, and funeral expenses, as well as the mental anguish resulting

from Matthew Osborne's death and the loss of his positive benefits of love, comfort, companionship, and society, as well as lost income and lost inheritance.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff, Decedent, and Decedent's heirs are residents of a different state from Defendant and because the value of the matter in controversy exceeds $75,000.

15.     Venue is proper in the Northern District of Texas, pursuant to 28 U.S.C. § 1391.

## PARTIES

16.     Plaintiff Michelle James is the mother of Matthew Osborne and Taylor Osborne, the minor children of Decedent Matthew Osborne.  She is a citizen and resident of Pennsylvania.

17.     Matthew Osborne is a fourteen year old minor, and resides with his mother, Plaintiff Michelle James, at her residence in Pennsylvania.  Matthew Osborne is a successor in interest to his father's, Matthew Osborne's, estate.

18.     Teagan Osborne is a seventeen year old minor, and resides with her mother, Plaintiff Michelle James, at her residence in Pennsylvania.  Teagan Osborne is a successor in interest to her father's, Matthew Osborne's, estate.

19.     Defendant World Wrestling Entertainment, Inc. is a Delaware corporation doing business in the state of Texas.  Defendant maintains a principal place of business address of 1241 E. Main Street, Stamford, Connecticut 06902-3520.  Defendant may be served with process through its registered agent, C T Corporation at 350 North St. Paul St., Dallas, Texas 75201.

20.     Although WWE is a public company, it is controlled by a small group of related executives who manage both policies and the conduct of wrestlers during matches.  Vincent K. McMahon has been Chairman of WWE since the retirement of his father, Vincent McMahon,

Sr., in 1980.  Vincent K. McMahon has served as CEO from 1980 to 1993, and from 2009 to the present.  McMahon controls over 80 percent of WWE's voting power.  McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009.  Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer.  Her husband, Paul Levesque is Executive Vice President, Talent, Live Events & Creative.

## FACTUAL ALLEGATIONS

### I.      Background: WWE and Its Wrestlers

21.     WWE is the largest wrestling entertainment organization in the world.  Since purchasing its main competitor, World Championship Wrestling in 2001, WWE has had no serious competitors in the field of wrestling entertainment.   The company generates approximately $500 million in revenue annually.

22.     The majority of WWE's revenues stem from its televised wrestling events.  WWE programs consistently rank among the most popular in weekly television ratings.   WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

23.     For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

24.     WWE calls itself an "action soap opera".[2]   Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot.   WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other.

2 Examiner.com, "WWE to be called an 'action soap opera' not pro-wrestling. Bans more terms" (Apr. 13, 2011), available at, http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

25.     Matthew Osborne would fight hundreds of times per year.   And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

26.     Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance.  Wrestlers are effectively on their own.

27.     WWE scripts events and matches, including some moves.  The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts.

28.     Throughout the history of WWE, wrestlers, including Matthew Osborne, look to and rely on their trainers, bookers, and WWE staff, both to provide specific direction from WWE, and to ensure their safety during performances.

II.     **The Science of Head Trauma**

29.     The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over his career, Matthew Osborne suffered repeated concussions and countless sub-concussive blows.

30.     Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and personal interviews.[3] The Centers for Disease Control and Prevention ("CDC") define concussions as a type of TBI caused

---

3 National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at http://www.cdc.gov/ncipc/pubres/mtbi/report.htm.

by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow.

31.    Many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

32.    Even absent a loss of consciousness, each concussion alters the way the brain functions.  Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5]  Although concussion research continues to grow, WWE had actual notice of these symptoms during Plaintiffs wrestling careers as concussion research had already established these symptoms as evidencing concussions.[6]

33.    Post-concussion syndrome remains with a person for days, weeks or even months. Indeed, while, "[s]ome of these symptoms may appear right away. . . others may not be noticed for days or months after the injury."[7] In some cases, concussions can cause bleeding in the brain, which can be fatal.[8]  This also has been evident to the medical community since Plaintiffs were

---

4 Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), *available at* http://www.cdc.gov/concussion/signs_symptoms.html.

5 Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), *available at* http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.

6 Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION =2.

7 Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), http://www.cdc.gov/concussion/signs_symptoms.html.

8 Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseasesconditions/concussion/basics/causes/con-20019272.

9

employed by WWE, providing WWE's medical personnel with the necessary information to diagnose and treat Plaintiffs' concussion and sub-concussive symptoms and injuries.[9]

34.    Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can amplify the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling."  Even in 2005, the Mayo Clinic recognized "a violent blow to your head can cause your brain to slide forcefully against the inner wall of your skull…A concussion causes at least a temporary loss in brain function.  Although losing consciousness is a common sign of a concussion, it's possible to suffer a concussion without being completely knocked out."[10]

35.    The WWE and WWE's medical personnel were in a unique position to have the wealth of medical literature on concussion and sub-concussive injuries in their possession, and in fact, had a duty to have such information available to them in order to practice to the standards of the medical profession during the years Plaintiffs were wrestling.  Therefore, it can be imputed that WWE was knowledgeable about the likelihood head trauma would cause concussions and sub-concussive injuries and the resulting long-term neurological injuries, and had actual notice and knowledge as to the signs and symptoms associated with concussion and sub-concussive injuries when Plaintiffs were wrestling for the WWE.

36.    CTE is a disorder caused by neurodegeneration including cognitive and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an

---

9 Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION =2.

10 Mayo Clinic, "Concussion: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION =3.

increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

37.     CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[11]

38.     CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to an NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sub-lethal brain trauma that often occurs well before the development of clinical manifestations."[12]

39.     As dangerous as individual concussions and sub-concussive blows can be in the short term, the long-term effects are more debilitating and insidious. Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

40.     Many sufferers of CTE spend years with no idea—and no way of knowing—that they suffer from this disorder.

41.     Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma that happened years ago, with no

---

11 Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 AM. J. FORENSIC MED. PATHOLOGY 130, 132 (2010).

12 Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. NEUROPATHOL EXP NEUROL. 2009 July; 68(7): 709–735.

reason or warning to suspect the true cause, these symptoms can be bewildering as well as debilitating.

42.     Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their careers were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[13]

43.     As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

III.     **WWE Created a Culture of Violence and Sacrificed Matthew Osborne's Brain for Its Own Profit.**

44.     During WWE matches, wrestlers including Matthew Osborne, performed activities that are exceedingly dangerous to himself and to his adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

45.     For wrestlers like Matthew Osborne directed to perform complicated and dangerous stunts day after day, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling schedule, meaning they are often tired during their matches and more prone to inflict and suffer traumatic injury.

46.     It is commonplace for WWE wrestlers to experience numerous concussions over their careers, during which many fight hundreds of times each year.  A wrestler such as Matthew

---

13 Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 MED. & SCI. SPORTS & EXERCISE 903, 906 (2007)

Osborne sustained repeated concussions day after day over many years, resulting in a greatly increased chance of CTE and related illnesses.

47.     Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

48.     WWE intentionally and willfully adds what it calls "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives in 2007, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[14]  She provided an example of "heat," stating:

> For example, if there are a number of guys in the ring, like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[15]

49.     To elicit "heat" in events, WWE directs its wrestlers to use various weapons.  As Ms. Levesque's testimony suggests, WWE instructs its wrestlers to use metal chairs to batter each other.  In countless WWE matches, fighters have slammed chairs over the heads of their opponents.  Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.  In many instances,

---

14 *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.

15 *Id.* at 120.

these chair shots have delivered dangerous levels of force to the recipient's skull including to Matthew Osborne.

50.     The chair shot itself, though supposedly banned in 2010, is an iconic image of concussion-causing destruction which WWE utilizes to its fullest in advertisements and promotions.[16]  Even Paul Levesque, a WWE executive and son-in-law to Vincent K. McMahon, has used chair shots since 2010 in performances, as a wrestler under the name "Triple H."[17]

51.     WWE's announcers commonly revel in the ability of wrestlers to fight through injuries, downplaying concussions as mere "wooziness."

52.     These beatings, though nominally "fake," greatly increase the chance of wrestler injuries, particularly when a wrestler administering the "heat" commits an error. But even where no error is committed, the "heat" administered by wrestlers results in blows to the head.

53.     Some of these moves involve acrobatic feats that involve lifting opponents more than six feet in the air.

54.     During WWE practice and WWE matches, Matthew Osborne sustained thousands of hits to his head as part of scripted and choreographed moves.

55.     Instead of stopping events when Matthew Osborne sustained injuries, WWE allowed such events to continue, requiring Matthew Osborne to fight through the pain, and subjecting him to the long-term consequences of cumulative brain injury.

56.     Even the most basic wrestling move, the "bump," involves the risk of injury to the head and spine.  A bump involves falling to the mat backwards so the wrestler lands on his back.

---

16 See Geno Mrosko, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), available at http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-headto-promote-its-network.

17 David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair shots to the head" (Apr. 4, 2011), available at http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-wwe-had-unbannedchairs-to-the-head.

Wrestlers are taught to and are directed by WWE to fall so that the top of their back hits the mat, and to avoid hitting their heads.  However, depending on the speed at which they are taking the bump, wrestlers hit their heads or necks resulting in head injuries.  Matthew Osborne conducted this move multiple times over his career.

57.     Over time, these blows greatly increased the chance of CTE in Matthew Osborne.

**IV.     WWE Was Aware of the Dangers to Matthew Osborne and Covered It Up**

      A.     **Through Medical Literature, WWE Knew or Should Have Known the Risks Associated With Its Activities**

58.     As previously alleged, WWE knew or should have known during Matthew Osborne's WWE career of the growing body of scientific evidence and its conclusions that persons such as Matthew Osborne who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their wrestling careers, or especially, later in life.

59.     WWE was and is aware of the risks of repeated head trauma and multiple concussive events caused by wrestling in their matches.  In 2007, a WWE executive admitted that "WWE wrestlers are at risk for concussions because of the nature of their work."  And yet, WWE continues to understate the risks and dangers of CTE, as evidenced by Dr. Joseph Maroon's statements to the NFL Network, Total Access in March 2015, "The problem of CTE, although real, is its being over-exaggerated".[18]  WWE and its medical personnel use their unique positions of authority and superior knowledge to quell their wrestlers', including Matthew Osborne's, fears regarding injuries and convince him it is safe to continue wrestling through concealment of necessary information, omission of pertinent medical information, and failures to

_____

18 NFL Network, NFL Total Access, "Dr. Maroon: The NFL Has Never Been Safer", (March 2015), *available at* http://www.nfl.com/videos/nfl-network-total-access/0ap3000000479597/Dr-Maroon-The-NFL-has-never-been-safer

properly assess, diagnose, and treat their wrestlers', including Matthew Osborne's injuries, leading to Matthew Osborne's reliance to his detriment on WWE's allowance of his continuing to wrestle and perform after suffering symptoms of concussions and sub-concussive injuries and being allowed and encouraged to fight through the pain and continue wrestling despite having suffered concussions and sub-concussive injuries.

60.     For decades spanning back to the 1920s WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction.[19] Specifically, WWE was aware in 2005 and beyond that wrestling for the WWE and suffering head trauma would result in long-term injuries.[20]   And it therefore should have, but never did, warn Matthew Osborne of the risks of concussions and other brain injuries associated with wrestling with WWE.

61.     The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades to the medical community. Below is a selection of mounting medical literature concerning head trauma:

- During the 1950s, 60s, 70, 80s and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and the long term implications of such injuries (which include loss of brain function and dementia).

---

19 *See* http://concussioninc.net/?p=3286

20 *See* Mayo Clinic, "Concussions: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION =3.

- In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.

- In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).

- In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

- A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

- In 2007, scientists concluded that a former WWE wrestler had suffered from CTE. Scientists concluded in 2009 that a second former WWE wrestler had suffered from the same affliction.

62.     WWE knew, or should have known, about this and other research demonstrating the dangers of receiving concussive and sub-concussive blows to the head.  Moreover, WWE knew or should have known that the research associated with boxing, hockey, and football also reflected dangers associated with WWE wrestling. Indeed, for the reasons set forth above,

17

wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows to the head than athletes in those sports.

B.    **WWE Has Attempted to Cover Up the Dangers of Head Trauma Associated With Wrestling**

63.    WWE engaged in a campaign of misinformation and deception to prevent Matthew Osborne from understanding the true nature and consequences of the injuries he sustained.

64.    WWE concealed important medical information, including the effects of multiple head traumas, and prematurely allowed Matthew Osborne to return to the ring or to practice, even when injured. As a result, wrestlers, including Matthew Osborne, suffered serious permanent and debilitating injuries and damages.

65.    WWE has continually represented directly to Matthew Osborne, and indirectly to him through the public, that the safety of its wrestlers is a top priority. To take but one example, Vincent K. McMahon told the Committee on Oversight and Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[21]

66.    The NFL had created the Mild Traumatic Brain Injury Committee in 1994. The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms. In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all

---

21 Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahons-Testimony-to-Waxman-committee.

players believed to have concussions.  Yet WWE waited nearly a decade before adopting similar policies.

67.     Indeed, WWE has systematically denied to Matthew Osborne and his co-wrestlers that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned Matthew Osborne about the risk of sustaining numerous sub-concussive and concussive blows.

68.     For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history.[22]

69.     At the time of Levesque's testimony, WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions. To deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

70.     Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in July 2005.  A month previously, Terry Long, a 45 year old Pittsburgh Steelers player committed suicide.  Dr. Omalu opined that the cause may have been brain damage in line with his studies.

71.     In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE attempted to discredit these studies.

72.     Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, attacked this conclusion.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may

---

22 *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at
http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.

have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative…"

73.     WWE responded on ESPN, stating, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85 year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[23]

74.     WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[24]

75.     In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

76.     He further commented to ESPN after studying WWE former wrestler Andrew Martin's brain: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in

---

23 *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

24 Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).

general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[25]

77.     In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes' finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

78.     The NFL engaged in a protracted debate about the mounting evidence linking head trauma to CTE and the severe, long-term resulting injuries.  After attempting to discredit the research of doctors examining brain tissue of deceased NFL players, the NFL acknowledged its mistake in July of 2010 and began noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

79.     Through its actions of failing to properly assess, diagnose, and treat wrestlers such as Matthew Osborne who suffered concussion and sub-concussive injuries during their scripted performances and who showed clear signs of concussion, sub-concussive injury and CTE symptoms, evidence WWE's refusal and ongoing, continued refusal to properly inform and provide necessary medical care to wrestlers such as Matthew Osborne throughout their WWE career despite this wealth of information uniquely at WWE's disposal.

80.     WWE created its "Wellness Program" in 2006, and selected Dr. Maroon as its architect, despite his involvement in public efforts to discredit Dr. Omalu's research. An attorney for WWE has been publicly credited with establishing the "medical-testing program to protect

---

25 See ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

wrestlers' health."[26]   That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[27] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up.[28]

81.     WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[29]

82.     The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006… Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[30]

83.     The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[31]

84.     The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse, but these contacts fail to advise former wrestlers, including Matthew Osborne, about head injuries.

---

26 Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) available at http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609.

27 *Id.*

28 *Id.*

29 *See* http://concussioninc.net/?p=9617.

30 *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, last accessed February 13, 2015.

31 *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

85.    WWE has stated that it has "the finest monitoring program in American Sports," thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.

86.    WWE's Wellness Program served to deceive Matthew Osborne by providing a false sense of security and assurance that his health and safety was being adequately monitored, both in the ring and as a former wrestler.  The Wellness Program, by purporting to protect Matthew Osborne, merely led him into not seeking adequate treatment or otherwise protecting his health.

87.    By concealing known risks and downplaying the injuries suffered during matches, and by prematurely clearing wrestlers who needed recuperation time, WWE denied Matthew Osborne the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor himself for long term brain damage.

88.    In reliance on both misleading statements issued by WWE attempting to downplay the severity of concussion and sub-concussive injuries, as well as WWE's actions in failing to properly assess, diagnose, and treat concussion and sub-concussive injuries, Matthew Osborne failed to take actions which otherwise could have mitigated his injuries, both during and after his wrestling career, and before his untimely death.

V.    **Deaths of Wrestlers in WWE**

89.    The number of wrestlers that have died who wrestled in the WWE at one time or another is simply astonishing and unprecedented in the history of athletics.[32]  A well-known journalist who follows the issue observed: "literally the dozens of wrestlers in their twenties,

---

[32] Nearly all wrestlers have worked in other organizations during their career.

23

thirties, and forties have dropped dead in the last two decades- a staggering epidemiological trail hidden in plain sight, noticed by few, cared about by fewer still."[33]

90.     Vince McMahon, the owner of the WWE, was asked about the death rate in wrestling in an infamous interview with investigative reporter, Armen Keteyian in a TV program titled "Deaths in Pro Wrestling" that aired on June 24, 2003 on HBO Real Sports.  Keteyain asked Mr. McMahon, "Do you have a reason why these people would be dying under the age of 45?" and "If [the death rate] in any way shape or form falls on your shoulders?" Mr. McMahon replied, "I would accept no responsibility whatsoever for their untimely deaths, none whatsoever." Keteyain pressed: "But none whatsoever? I mean they wrestled for you, they were part of your organization, they worked a couple hundred nights a year for you, they lived this lifestyle." Mr. McMahon becomes visibly agitated and flicked a folder at Mr. Keteyain. More than a decade after this interview, it is clear, based on the increasing rate of deaths of both former and current wrestlers, that little if anything has changed within the WWE.

91.     Below is an incomplete list of nearly forty of those wrestlers who worked with the WWE at one time or another and lost their lives prematurely. These men and women are no longer here to tell their tragic story: they nearly all either fell in the terrible cycle of drug addiction, suffered heart attacks, or in some cases, committed suicide, an unfortunately prevalent cause of mortality among WWE wrestlers.

---

33 Muchnick, Irvin, Wrestling Babylon, p. 136 (ECW Press 2007).



92.     Andrew Martin, a WWE wrestler also known by his ring name "Test," died March 13, 2009 at the age of 34 of an apparent drug overdose. Mr. Martin's brain tissue was examined by a forensic pathologist who diagnosed him with Chronic Traumatic Encephalopathy (CTE) caused by repeated concussions and head injuries.



93.     Lance Kurtis McNaught, a WWE wrestler also known by his ring name Lance Cade, died August 13, 2010 at the age of 29 of a heart attack that may have been drug-related.



94.      Sean Christopher Haire, a WWE wrestler also known by his ring name Sean O'Haire, died September 8, 2014 at the age of 43. It was reported that Mr. Haire committed suicide after battling depression and personality changes.



95.      Steve Bradley, a WWF wrestler, died December 4, 2008 at the age of 32.  He died of a possible drug overdose.

26



96.     Chris Candido, a WWE wrestler, died on April 28, 2005 from wrestling related injuries at the age of 33.



97.     Tony Halme, a WWE Wrestler known by the ring name Ludvig Borga, died January 8, 2010 at the age of 47. Mr. Halme allegedly committed suicide with a handgun.



98.     Christopher Klucsarits, a WWF Wrestler known by the ring name Chris Kanyon, died on April 2, 2010 at the age of 40. Mr. Klucsarits allegedly committed suicide by overdosing on drugs.



99.     Edward Smith "Eddie" Fatu, a WWE wrestler known by the ring name Umaga, died on December 4, 2009 at the age of 36. He died of a heart attack which was reportedly related to drug use.



100.    Steve Doll, a WWF wrestler known by the ring name Steven Dunn, died on March 22, 2009 at the age of 48. Mr. Doll died of a blood clot due to long term injuries sustained while wrestling.



101.    Brian Keith Adams, a WWF wrestler known by the ring name Crush died on August 13, 2007 at the age of 43. He died of an apparent drug overdose.

29



102.    Mike Lee Alfonso, a WWF wrestler known by the ring name Mike Awesome, died on February 17, 2007 at the age of 42. He died of apparent suicide.



103.    Scott Charles Bigelow, a WWF Wrestler known by the ring name Bam Bam Bigelow died January 19, 2007 at the age of 45. He reportedly died of a drug overdose and heart disease.

30



104.    Eddie Guerrero, a many time WWE champion wrestler, died November 13, 2005

at the age of 38. Mr. Guerrero died of heart failure after battling drug addiction.



105.    Raymond Fernandez, a WWF wrestler known by the ring name Hercules

Hernandez, died March 6, 2004 at the age of 47. He died of a heart attack.



106.    Michael John Lockwood, a WWF/WWE wrestler known by the ring name Crash

Holly, died November 6, 2003 at the age of 32. Mr. Lockwood reportedly committed suicide by

drug overdose.



107.    Michael Hegstrand, a WWF wrestler known by the ring name Road Warrior

Hawk, died October 19, 2003 at the age of 43. He died of a heart attack.

32



108.    Terry Ray Gordy, a WWF wrestler known by the stage name the Executioner, died July 16, 2001 at the age of 40. He died of a heart attack.



109.    Anthony Durante, a WWF wrestler known by the ring name Pitbull #2, died September 25, 2003 at the age of 36. He allegedly died of a drug overdose.



110.    Curt Henning, a world champion WWE wrestler known by the ring name Mr.

Perfect, died on February 10, 2003 at age 44. He died of a reported drug overdose.



111.    Raymond Traylor, Jr., a WWF wrestler known by the ring name The Big Boss

Man, died September 22, 2004 at age 41. He died of a heart attack.

34



112.    Rodney Agatupu Anoa'I, a WWF wrestler known by the ring name Yokozuna, died October 23, 2000 at age 34. He died of pulmonary edema, weighing 580 pounds.



113.    Owen James Hart, a WWE world champion wrestler, died May 23, 1999 at age 34. He fell to his death while performing a stunt during a live WWE event.



114.     Richard Erwin Rude, WWE wrestler, stage name Ravishing Rick Rude died April

20, 1999 at age 40. He died of heart failure that was reportedly related to drug abuse.



115.     Louis Mucciolo, Jr. WWF wrestler, stage name Rad Radford died February 15,

1998 at age 27. He reportedly died of a drug overdose.



116.    Brian William Pillman, WWF wrestler, died October 5, 1997 at age 35. He died of heart failure.



117.    Kerry Von Erich, WWF wrestler, died February 18, 1993 at age 33. Mr. Von Erich reportedly committed suicide. Mr. Von Erich came from a noted wresting family, and two of his brothers who wrestled professionally also died by their own hand.



118.    Eddie Gilbert, a WWF wrestler known by the stage name "Hot Stuff," died February 18, 1995 at age 33. He died of a heart attack that was reported to be drug-related.



119.    Randy Savage, known by the stage name "Macho Man" was widely considered one of the best and most popular wrestlers of the modern era. He died May 20, 2011 at age 58 of heart failure.



120.    Elizabeth Ann Hulette, a WWF wrestler known by the stage name Miss Elizabeth,

died May 1, 2003 at the age of 42. She died of a reported drug and alcohol overdose.



121.    Warrior (formerly known as James Brian Hellwig), a WWF wrestler known by

the stage name Ultimate Warrior, died April 8, 2014 at age 54. He died of a heart attack three

days after being inducted into the WWE Hall of Fame.



122.    Doug Furnas, a WWF wrestler, died March 2, 2012 at the age of 52. He died of a heart attack; he also suffered from Parkinson's disease.



123.    Mike Shaw, a WWF wrestler known by the ring name Bastion Booger, died September 11, 2010 at the age of 53. He died of a heart attack.



124.    Robert Bradley James, a WWE wrestler, died November 1, 2012 at the age of 51.

He died of an apparent heart attack.



125.    Shawn McGrath, a WWE wrestler with the ring name Shawn Osborne, died

January 26, 2011 at the age of 34. He allegedly committed suicide.



126.    Gertrude Elizabeth Vachon, a WWF wrestler known by the ring name Luna

Vachon, died August 27, 2010 at the age of 48. She died of an apparent drug overdose.



127.    Rhonda Ann Sing, a WWF wrestler known by the stage name Monster Ripper,

died July 27, 2001 at the age of 40. She died of a heart attack.



128.    Sherri Schrull, a WWF Women's Champion wrestler, died June 15, 2007 at the age of 49. She died of an apparent drug overdose.



129.    David Boy Smith, a WWF wrestler known as Davey Boy Smith, died May 18, 2002 at the age of 39. He died of an apparent drug abuse related heart attack.



130.    Chris Benoit, WWE wrestler died June 24, 2007 at the age of 40. In one of the most infamous events in the WWE's tragic history, Mr. Benoit killed his wife and son before taking his own life. Mr. Benoit's brain was examined and he was found to have Chronic Traumatic Encephalopathy (CTE). The neurologist who studied the tissue reported that, "Benoit's brain was so severely damaged it resembled the brain of an 85-year-old Alzheimer's patient."

131.    The death rate among WWE wrestlers has yet to be subjected to statistical analysis by an expert qualified to conduct a such a study; however, upon information and belief, such an analysis would indicate that the death rate among wrestlers exceeds that of any similar athletic profession or any professional sport.

VI.    **WWE Had a Duty to Matthew Osborne and Breached That Duty**

132.    WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the neurological risks associated with head injuries suffered while wrestling for WWE.   WWE had superior knowledge and access to information, and should have disclosed that information to Matthew Osborne and not concealed such information.

44

133.    By virtue of its employment of medical staff and provision of treatment to Matthew Osborne, WWE assumed a duty to conduct itself reasonably and to provide these services with reasonable care. WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring.  Matthew Osborne reasonably relied on these medical personnel in determining whether he should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment.

134.    WWE's doctors and medical personnel failed to properly monitor, diagnose, and treat Matthew Osborne before, during, and after the wrestling matches, in some cases allowing him to return to the ring despite "wooziness"—a sign of brain trauma.

135.    WWE undertakes to train all wrestlers including those against whom Matthew Osborne wrestled, and therefore WWE had a duty to do so with reasonable care.  In fact, the training provided was inadequate and unreasonable, causing Matthew Osborne harm.

136.    Upon information and belief, WWE regularly collected and continues to collect wrestler injury reports, including during Matthew Osborne's career with WWE, becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis.  Matthew Osborne, lacking this information, had to rely on WWE to inform him of his health and safety information relating to his wrestling career with WWE.

137.    By issuing statements and engaging in programs to address Matthew Osborne's health, WWE had a duty to ensure that these statements were complete and were not misleading or fraudulent.   Instead, WWE provided incomplete information to Matthew Osborne, who reasonably relied on it to his detriment.

138.     Contrary to its assertions concerning safety, WWE demanded Matthew Osborne perform acts which it knew or should have known cannot be performed safely.  For example, the use of dangerous weapons like steel chairs against the head by wrestlers cannot be done safely.

139.     Upon information and belief, WWE has as recently as 2015 implemented the use of helmets during training at WWE training facilities.  Helmets had previously not been worn by wrestlers at the WWE training facilities and were not worn by Matthew Osborne when he trained and wrestled with WWE.



Captured from embedded video on WWE's WWE Tough Enough Facebook page, *available at* https://www.facebook.com/WWEtoughenough/videos/vb.181273445231240/ 1012037205488189/?type=2&theater, posted on June 11, 2015.

140.     In addition to its failure regarding head injuries, WWE failed to care for and monitor Matthew Osborne's cardiac health.   WWE's Wellness Policy advises, "WWE implemented its Talent Wellness Program on February 27, 2006… Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and

Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substances Abuse

and Drug Testing, Annual Physicals, Health Care Referrals".[34]

141.    The Policy further reads:

**Cardiovascular Testing and Monitoring Program**
All WWE talent undergo an extensive cardiovascular stress test before they are
offered a contract by WWE, and subsequently tested at least biennially while
under contract (more frequently as and when circumstances warrant).  Dr. Bryan
Donohue, Division Chief of Cardiology at University of Pittsburgh Medical
Center Shadyside Hospital, and Senior Partner at Donohue Cardiology
Associates, administers WWE's cardiovascular testing and monitoring program.
**Referrals to Consulting Health Care Providers On An As Needed Basis**
WWE offers all WWE talent the opportunity for referral to qualified health care
professionals who can help them with issues that may arise from time to time.
Under the supervision of Dr. Maroon, WWE has established relationships with
renowned specialists in psychiatry, orthopedics and endocrinology.
WWE Wellness Policy

142.    WWE assumed and voluntarily undertook a duty to its wrestlers, including

Matthew Osborne.  That duty did not end when he stopped wrestling for WWE.  With the

pronouncements on WWE's website about its cardiovascular knowledge and substance abuse

counseling, WWE had a duty, or voluntarily took on the duty, to provide such care and treatment

non-negligently to Matthew Osborne, into his post-WWE career years.

VII.    **Facts Concerning the Decedent, Matthew Osborne**

143.    Matthew Osborne began wrestling for WWE in Oregon in 1985 after being

approached by Vince McMahon.  Matthew Osborne would fight under numerous ring names

throughout his wrestling career, most famously as Matt Borne and Doink the Clown.

---

34 See Corporate WWE.com, available at http://corporate.wwe.com/wellness/talent-wellness-summary.



144.    Matthew Osborne wrestled in hundreds of matches for WWE, participating in numerous house and show matches, including Monday Night Raw and Wrestlemania.

145.    Matthew Osborne's WWE scripted and directed performances would utilize props such as glass beer bottles, metal chairs, and metal chains which Matthew Osborne would have hit on his head and broken over his head repeatedly throughout his tenure with WWE.

146.    One example of the typical head injury Matthew Osborne suffered routinely and repeatedly throughout his career with WWE was explained by the WWE commentators themselves in WWF Wrestlemania 1 on March 31, 1985, wherein Matthew Osborne had just been thrown onto his head and was immediately picked back up and thrown down onto his head again: "He came up just moments ago holding onto that what we call an external occipital protuberance on the back of your head there and he really went down on that hard."[35]  Despite WWE's referee being cognizant of the wrestlers' conditions throughout the match, and despite the medical personnel at the ring, WWE failed to remove Matthew Osborne from the match to

---

[35] *See* Ricky Steamboat vs. Matt Borne (WM1), Daily Motion, http://www.dailymotion.com/video/x5dyib_ricky-steamboat-vs-matt-borne-wm-i_sport, *last accessed* June 23, 2015.

48

seek medical treatment for his injuries.  The commentators continued to express with seeming dismay the obvious symptoms of concussions and sub-concussive injuries Matthew Osborne was showing by noting: "Look at Borne, he doesn't know where he is right now, Jess." "That's right, he's seeing stars."[36]

147.    Matthew Osborne had no reason to believe that suffering repeated injuries to his head, neck, and spine could result in long-term illnesses, diseases, and injuries and had no reason to believe that the injuries he was receiving while performing for WWE would cause latent, long-term injuries.

148.    Matthew Osborne was never informed by WWE that receiving head trauma could result in a concussion or sub-concussion.

149.    Matthew Osborne, even if he had been aware that receiving head trauma could result in a concussion or sub-concussion, would not have known that repeated concussions and sub-concussions would likely result in long-term, latent illnesses, diseases, and injuries.

150.    Medical personnel for WWE would assess Matthew Osborne's injuries during and after performances, and Matthew Osborne relied on WWE's medical knowledge and information to properly assess, diagnose, and treat his injuries, and to tell him whether he should seek out further medical treatment.

151.    Medical personnel, including doctors hired by WWE would be present in the locker rooms and would offer prescription medications and would ask how Matthew Osborne was feeling and what was wrong if he was injured, offering medical advice and medical services to Matthew Osborne.  Matthew Osborne would receive prescriptions from these WWE doctors, and would take the medications pursuant to the medical advice and treatment provided by the

---

36 *Id.*

WWE doctors.  Matthew Osborne reasonably relied on the medical advice provided by WWE's doctors, as well as the medical advice not provided, including the failure to diagnose concussions and sub-concussive injuries, and the failure to prescribe the necessary treatment for these injuries.

152.    Sports trainers hired by WWE would be present at both television events and house matches.  These sports trainers would be equipped with sports tape, peroxide, and other equipment to aid in the wrestlers' performances.  These sports trainers would assess any injuries sustained at the matches and determine whether x-rays would be necessary in the event of a more serious injury.  The sports trainers would wrap sprains with sports tape and douse open wounds in peroxide.  Matthew Osborne relied on the sports trainers to properly assess his injuries and to prescribe the proper form of treatment necessary for a healthy recovery.

153.    Matthew Osborne reasonably relied on WWE's medical personnel, trainers, agents, and documents when he continued to fight and receive sustained head trauma repeatedly over twenty years which resulted in repeated concussions and sub-concussions causing latent, neurological injuries only later beginning to manifest itself in severe headaches and neurological illness, including depression and substance addiction.

154.    After fighting in hundreds of matches, Matthew Osborne received no information on concussion and sub-concussive injuries and was completely unaware of the connections between the head trauma sustained in WWE with concussion and sub-concussive injuries.

155.    Matthew Osborne was never educated about the ramifications of head trauma and injury and the likelihood of concussions and sub-concussions and the resulting latent neurological injuries suffered from sustaining concussions and sub-concussions, despite

receiving routine pamphlets and information on his health and safety as a retired WWE wrestler from WWE's Talent Wellness Program.

156.    Matthew Osborne was never provided health insurance, and so relied solely on WWE's medical professionals for his medical diagnosis and treatment as well as prescription medication.

157.    Continuing after Matthew Osborne no longer wrestled for WWE, WWE provided and paid for Matthew Osborne to attend a drug rehabilitation program at White Deer Run in or around 1999.

158.    The severe results from the trauma sustained while fighting for WWE continued to manifest itself in physical injuries such as sciatica and depression and anxiety, manifesting itself in mood swings, substance abuse, and cardiac complications.

159.    In further relying on WWE's special relationship and unique position of authority regarding Matthew Osborne's health and safety, Matthew Osborne continued to rely on WWE's medical knowledge and information, including WWE's Talent Wellness Program, regarding concussions and sub-concussive injuries by not seeking and receiving treatment for neurological injuries relating to concussion and sub-concussive injuries.

160.    Despite WWE's Talent Wellness Program, despite WWE's knowledge of Matthew Osborne's neurological injuries and diseases, and despite Matthew Osborne continuing to rely on WWE's knowledge and information regarding his health and safety, WWE never informed Matthew Osborne about the concussions and sub-concussive injuries he suffered and the resulting and greater risks, illnesses, and diseases he was likely to suffer from, nor did WWE inform him of the necessity to receive proper medical treatment.

161.    As a direct and proximate result of WWE's failure to properly monitor, assess, diagnose, and treat Matthew Osborne's injuries, and failure to non-negligently and non-fraudulently inform him of the risks of concussions and sub-concussive injuries, Matthew Osborne died at the age of fifty-five at his home in Plano, Dallas County, Texas from an accidental drug overdose and arterio-sclerotic and hypertensive cardiovascular disease.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATION

162.    Matthew Osborne reasonably relied on WWE's statements to inform him about his safety and health. As a direct result of statements and conduct (and omissions) outlined above, Matthew Osborne was lulled into inaction by WWE.

163.    Matthew Osborne reasonably acted on what WWE omitted – that concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

164.    WWE was obligated to disclose, but failed to disclose,  vital information to Matthew Osborne based upon its special relationship with its wrestlers, assumed duty of care, voluntary undertaking of the Wellness Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma.  WWE affirmatively concealed facts, and continues to conceal facts, which prevented Matthew Osborne from discovering his claims.

165.    To the extent that it is applicable, the statute of limitations is tolled because of Defendants' fraudulent concealment of the dangers and adverse effects of head injuries, the risks

associated with wrestling, the injuries suffered while wrestling, and the negligent medical care provided to Matthew Osborne through WWE.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

166.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

167.     Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Matthew Osborne material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

168.    WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.

169.    WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Matthew Osborne, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

170.    WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Matthew Osborne without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

171.    WWE knew that Matthew Osborne would rely on the inaccurate information provided by WWE.

172.    Matthew Osborne did rely on this inaccurate information during and after his career with WWE.

173.    Defendant had a duty to disclose and warn Matthew Osborne about the actual knowledge it maintained about such injuries and the true nature of the risks posed to wrestlers. Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of  WWE wrestlers and Matthew Osborne, WWE routinely failed to inform Matthew Osborne of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries.  In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Matthew Osborne from receiving necessary medical treatment and preventing Matthew Osborne from receiving necessary information to make an informed decision regarding his health and safety.

174.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Matthew Osborne's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Matthew Osborne so he could take the necessary medical action and make informed decisions regarding his health and safety.

175.    WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

176.     Matthew Osborne reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Matthew Osborne.  Such reliance may also be imputed, based upon the materiality of WWE's wrongful conduct.  Accordingly, Matthew Osborne justifiably relied to his detriment on WWE's less than candid conduct and guidance, such conduct intended to deter his inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.

177.     As a direct and proximate result of Defendant's fraudulent acts and omissions as previously stated, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

178.     As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

179.     As a direct and proximate result of Defendant's fraudulent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

180.    As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

181.    Defendant acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to Matthew Osborne by not informing him of the risks of concussion and sub-concussive injuries and by failing to properly assess, diagnose, and treat Matthew Osborne to inform him of his injuries, of which WWE knew or had reason to know, giving rise to punitive damages.

### SECOND CAUSE OF ACTION
### FRAUD BY OMISSION / FAILURE TO WARN

182.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

183.    WWE had a duty to Matthew Osborne to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head. This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

184.    WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing

56

conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

185.   Matthew Osborne justifiably relied on WWE's fraudulent omissions to his detriment.

186.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Matthew Osborne's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Matthew Osborne so he could take the necessary medical action and make informed decisions regarding his health and safety.

187.   Had Matthew Osborne been aware of such information he would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

188.   As a direct and proximate result of Defendant's fraudulent and negligent acts and omissions as previously stated, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

189.    As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

190.    As a direct and proximate result of Defendant's fraudulent and negligent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

191.    As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

192.    Defendant acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to Matthew Osborne by not informing him of the risks of concussion and sub-concussive injuries and by failing to properly assess, diagnose, and treat Matthew Osborne to inform him of his injuries, of which WWE knew or had reason to know, giving rise to punitive damages.

### THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

193.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

194.     WWE negligently and/or recklessly misrepresented, omitted, and concealed from Matthew Osborne material facts concerning repetitive head impacts and related injuries.

195.    WWE materially misrepresented the risks faced by Matthew Osborne related to head, back, and spine injuries through misleading public statements, requiring him to fight

58

through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

196.    WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

197.    WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Matthew Osborne faced serious health problems if he returned to the ring too soon after sustaining a concussion.

198.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Matthew Osborne's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Matthew Osborne so he could take the necessary medical action and make informed decisions regarding his health and safety.

199.    WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

200.    WWE intended to induce Matthew Osborne's reliance on these misrepresentations.

201.    Matthew Osborne justifiably and reasonably relied on WWE's negligent misrepresentations to his detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

202.    Matthew Osborne acted and failed to act in reliance on these statements to his detriment.

203.    WWE failed to act with reasonable care by negligently failing to disclose material information to Matthew Osborne regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

204.    Defendant had a duty to disclose to Matthew Osborne any actual knowledge it possessed conceding such injuries and any associated risks it was aware of.

205.    As a direct and proximate result of Defendant's negligent acts and omissions as previously stated, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

206.    As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

207.    As a direct and proximate result of Defendant's negligent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

208.     As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

209.     Defendant acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to Matthew Osborne by not informing him of the risks of concussion and sub-concussive injuries and by failing to properly assess, diagnose, and treat Matthew Osborne to inform him of his injuries, of which WWE knew or had reason to know, giving rise to punitive damages.

## FOURTH CAUSE OF ACTION
## FRAUDULENT DECEIT

210.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

211.      WWE materially misrepresented the risks faced by Matthew Osborne related to head injuries.  WWE, through misleading and deceptive public statements and published articles, and downplayed known long-term health risks of concussions to Matthew Osborne.

212.     WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Matthew Osborne faced serious health problems if he was forced to return to the ring too soon after suffering brain trauma.

213.     WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Matthew Osborne's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Matthew Osborne so he could take the necessary medical action and make informed decisions regarding his health and safety.

214.    WWE intended to induce Matthew Osborne's reliance on the misrepresentations and to induce him to alter his position related to injury and risk.

215.    Matthew Osborne justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had he known the true risks to his health, he would have acted to protect his health.

216.    WWE's misrepresentations were substantial factors leading to Matthew Osborne's injuries, including his untimely death.

217.    As a direct and proximate result of Defendant's fraudulent acts and omissions as previously stated, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

218.    As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

219.    As a direct and proximate result of Defendant's fraudulent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

220.    As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

221.    Defendant acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to Matthew Osborne by not informing him of the risks of concussion and sub-concussive injuries and by failing to properly assess, diagnose, and treat Matthew Osborne to inform him of his injuries, of which WWE knew or had reason to know, giving rise to punitive damages.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE AND GROSS NEGLIGENCE**

222.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

223.    WWE has a duty to Matthew Osborne, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

224.    Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

225.    WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

226.    Defendant owed a duty to Matthew Osborne to exercise reasonable care in the safety and quality control of its wrestling matches.

227.    Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including to Matthew Osborne.

228.    WWE was aware, as previously described herein, of Matthew Osborne's actual injuries sustained while wrestling for WWE, including concussions and sub-concussive injuries.

229.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Matthew Osborne's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Matthew Osborne so he could take necessary medical action and make informed decisions regarding his health and safety.

230.    WWE held themselves out directly to its wrestlers, including Matthew Osborne, and indirectly to the public at large, as a purveyor of information regarding their wrestlers' health and safety, including Matthew Osborne's health and safety.  Matthew Osborne reasonably relied on the position of authority WWE held themselves out to possess regarding his health and safety and reasonably relied upon the information disseminated and not disseminated by WWE regarding his health and safety, including information on concussions and sub-concussions, and the assessments and diagnoses on him failing to diagnose him with concussions and sub-concussions.

231.    WWE failed to inform Matthew Osborne of the risks associated with concussions and sub-concussive injuries, and failed to provide Matthew Osborne with the necessary information to make informed decisions regarding his health and safety, despite holding a special relationship with Matthew Osborne whereby Matthew Osborne reasonably relied on WWE's knowledge and information regarding his health and safety.  As a result of WWE's failure to inform Matthew Osborne about the risks, dangers, and consequences from suffering concussions and sub-concussive injuries, and from failing to properly or adequately assessing, diagnosing,

64

and treating Matthew Osborne's injuries, Matthew Osborne suffered serious, permanent injury which resulted in his death.

232.     Each of the above listed acts and/or omissions, taken singularly or in any combination, rise to the level of gross negligence.  Defendant's acts and omissions, when viewed objectively from the standpoint of the actor at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of harm to others.  Defendant WWE had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.  Therefore, WWE was grossly negligent, for which WWE is liable for exemplary damages.

233.     As a direct and proximate result of Defendant's negligent and grossly negligent acts and omissions as previously stated, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

234.     As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

235.     As a direct and proximate result of Defendant's negligent and grossly negligent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew

Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

236.    As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

237.    Plaintiff has been damaged as a result of Defendant's negligent and grossly negligent conduct and hereby seek the full measure of damages allowed under applicable law.

238.    Defendant acted in conscious disregard of, or indifference to, the high degree of risk of physical harm to Matthew Osborne by not informing him of the risks of concussion and sub-concussive injuries and by failing to properly assess, diagnose, and treat Matthew Osborne to inform him of his injuries, of which WWE knew or had reason to know, giving rise to punitive damages.

## SIXTH CAUSE OF ACTION
## WRONGFUL DEATH

239.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

240.    In addition to the damages mentioned in the preceding paragraphs as a direct and proximate result of the intentional and unlawful conduct of WWE, Plaintiff has suffered and in reasonable probability will continue to suffer damages, as described in the paragraphs below. TEX. CIV. PRAC. & REM. CODE § 71.001, *et seq.*

241.    Matthew Osborne and Teagan Osborne were the minor children of Matthew Osborne at the time of his death at the age of 55, and are currently minors at the time of filing of this Complaint.   Both Matthew Osborne and Teagan Osborne are successors in interest to

Matthew Osborne's estate, and are entitled under Texas law to recover for their father's wrongful death, in part as a result of the willful and/or grossly negligent conduct by WWE.

242.    Plaintiff Michelle James, as mother and next friend of Matthew Osborne and Teagan Osborne, the minor children and successors in interest of Matthew Osborne, brings this wrongful death and survival action pursuant to TEX. CIV. PRACT. & REM. CODE § 71.001 – 71.011.  Minor children Teagan and Matthew Osborne are statutory beneficiaries, and may bring this action for the wrongful death of their beloved father, under the Texas Wrongful Death Act. As minor surviving children of the Decedent, they are entitled to recover damages for the following: pecuniary loss; termination of the child-parent relationship; mental anguish; loss of household services; and loss of inheritance, as noted herein.

243.    As a direct and proximate result of WWE's tortious acts and omissions, the Decedent Matthew Osborne suffered pain and mental and anguish from the time of injury to his death.  Matthew Osborne likewise incurred funeral expenses.  This claim survives to the Decedent's Estate and such claim is hereby made.

244.    Matthew Osborne's untimely death on or about June 28, 2013 was a direct and proximate result of having suffered multiple past traumatic brain injuries while wrestling for WWE beginning in 1985 and ending in 2007.

245.    WWE knew or should have known that Matthew Osborne's head trauma inflicted while performing the WWE scripted and directed stunts had a great likelihood of causing Matthew Osborne to sustain concussions and sub-concussive injuries.

246.    WWE knew or should have known based upon the information uniquely available to them that the head trauma sustained by Matthew Osborne did result in concussions or sub-concussive injuries.

247.    WWE knew or should have known that concussions and sub-concussions, as well as repeated concussions and sub-concussions, would result in harmful effects to Matthew Osborne's brain, including a significantly greater risk for chronic neuro-cognitive illness and disabilities, among which are potentially life-threatening illnesses, disabilities, and complications, both during his WWE career and especially later in life.

248.    Despite this information, WWE concealed these facts from Matthew Osborne, took affirmative steps to obfuscate these facts, and failed to inform Matthew Osborne about the realities of his injuries and the severe, long-term, latent neurological injuries which would result, with negligent disregard for Matthew Osborne's safety and life.

249.    WWE held a special relationship with Matthew Osborne resulting from the superior information WWE held regarding wrestling and wrestler's health and safety, as well as its position of authority over him.

250.    WWE had a duty, or voluntarily undertook a duty, to monitor, assess, diagnose, and treat Matthew Osborne, and to keep him reasonably informed about his health and safety pertaining to wrestling for WWE, both during and after his career with WWE.

251.    WWE failed to uphold this duty non-negligently by failing to properly monitor, assess, diagnose, and treat Matthew Osborne before, during, and after matches throughout his career.  Despite suffering repeated, sustained blows to his head, Matthew Osborne was allowed to continue wrestling and continue to sustain head trauma.

252.    Matthew Osborne reasonably relied on WWE's actions in not diagnosing him with concussions or sub-concussive injuries and not treating him for these injuries by not seeking appropriate medical care and treatment and by not refraining from wrestling until he had properly healed.

253.    Matthew Osborne continued to rely on WWE's actions and omissions after he stopped wrestling for WWE because WWE continued to send pamphlets from WWE's Talent Wellness Program regarding past-WWE wrestler's health and safety.  These pamphlets did not mention concussions, sub-concussions, or the risks associated with them.  As a result, Matthew Osborne continued to be ignorant of the dangers he was facing from the latent, neurocognitive injuries suffered while performing for WWE.

254.    As a direct and proximate result of WWE's wrongful acts, omissions, neglect, carelessness, and/or unskillfulness, Matthew Osborne experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage, concussions, sub-concussions and CTE, and the serious symptoms and disorders resulting from that damage, including an increased risk of further concussions and sub-concussions, depression loss of short-term memory, loss of awareness, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries which further resulted in lost and/or reduced income during his life, and ultimately caused or contributed to his untimely death.

255.    As a direct and proximate result of Defendant's conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

256.    As a direct and proximate result of Defendant's negligent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Matthew Osborne's love, companionship, comfort, affection, society, moral support, and solace related to Matthew Osborne's injuries during his life and related to his untimely death.

257.     As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, incur loss of financial support of Matthew Osborne's earning capacity in an amount to be determined at trial.

258.     As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, suffer mental and emotional anguish, pain, and suffering resulting from the loss of Matthew Osborne.

259.     As a direct and proximate result of Defendant's conduct, Plaintiff will, in the future, suffer the loss of household services, as well as the loss of inheritance, including the earnings, if any, of the Decedent in excess of the amount he would have used for the support of himself, and in which reasonable probability would have been added to his estate and left to his children at his natural death had he lived.

260.     As a further result and because of the reckless, willful, negligent, and grossly negligent conduct of the Defendant as previously alleged, Plaintiff is entitled to actual, consequential, and exemplary damages in an amount to be determined by a jury in accordance with the law and evidence in this case.

261.     Wherefore, Plaintiff, as the mother and best friend of the minor children of Matthew Osborne, Matthew Osborne and Teagan Osborne, is entitled to recover actual, consequential, and exemplary damages, together with costs of this action, and for such other relief as this Court may deem fit, just, and proper.

## SEVENTH CAUSE OF ACTION
## PUNITIVE DAMAGES

262.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above as if specifically stated herein.

263.     The conduct of Defendant, as set forth herein, above was intentional, willful, wanton, oppressive, malicious, and reckless, evidencing such an entire want of care as to raise the presumption of a conscious indifference to the consequences in that Defendant acted only out of self-interest and personal gain.   Such conduct evidences a specific intent to cause harm to Plaintiff as provided under TEX. CIV. PRACT. & REM. CODE § 41.001, *et seq*. and results from fraud, malice, and/or gross negligence. Accordingly, punitive damages should be imposed against Defendants pursuant to TEX. CIV. PRACT. & REM. CODE § 41.001, *et seq*. and other applicable laws, to punish and deter each Defendant from repeating or continuing such unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1. Compensatory, punitive and exemplary damages;

2. Special and incidental damages according to proof;

3. Costs and disbursements in the action, including reasonable attorneys' fees, to the extent permitted by law;

4. Interest as allowed by law; and,

5. For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

DATE: June 26, 2015

By: /s/ Shezad A. Malik_____
Dr. Shezad A. Malik
TX Bar No. 24053337
DR. SHEZAD MALIK LAW FIRM
4925 Greenville Avenue #320
Dallas, Texas 75206
Telephone: (214) 390-3189

Facsimile: (888) 210-9693
DrMalik@ShezadMalik.com

R. Christopher Gilreath (BPR #018667)
GILREATH & ASSOCIATES
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
Telephone: (901)527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com

Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd. Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

Erica Mirabella
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com

*Attorneys for Plaintiffs*